# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ERIC MEIER,

     **Plaintiff,**

     **v.**                               **Case No. 22-CV-483**

KILOLO KIJAKAZI,
**Acting Commissioner of Social Security,**

     **Defendant.**

## DECISION AND ORDER

Eric Meier seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his Title II application for a period of disability and disability insurance benefits and Title XVI application for supplemental security income under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision is affirmed and the case is dismissed.

## BACKGROUND

On December 29, 2005, when he was twenty-nine years old, Meier was involved in a motor vehicle crash where his car flipped over. (Tr. 268, 1243.) Meier suffered a cervical fracture as well as a hematoma in the brain. (Tr. 1243.) Meier had a cervical fusion with hardware, experienced some weakness after surgery, and spent some time in rehabilitation. (*Id.*) At the time of the accident, Meier was employed as a tattoo artist. (Tr. 268.) On September 30, 2011, Meier filed applications for Title II and Title XVI disability benefits, alleging disability beginning on December 29, 2005 based on: screw in first and second vertebra; cracked and slipped disc; bulging discs; pinched nerves in left leg with numbness to

the knee; "black discs"; anxiety; and depression. (Tr. 155, 162, 217.) Meier's date last insured for purposes of his Title II application is June 30, 2006. (Tr. 234.) Meier's applications were denied initially and upon reconsideration. (Tr. 770.) Meier filed a request for a hearing, and a hearing was held before an Administrative Law Judge ("ALJ") on December 19, 2014. (*Id.*) Meier, appearing *pro se*, testified, as well as Leslie H. Goldsmith, a vocational expert ("VE"). (*Id.*)

In a written decision issued February 20, 2015, the ALJ found that Meier had the severe impairments of degenerative disc disease, depression, anxiety, and chronic obstructive pulmonary disease. (Tr. 772.) The ALJ found that Meier did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). (Tr. 773–74.) The ALJ further found that Meier had the residual functional capacity ("RFC") to perform work involving lifting 20 pounds occasionally and ten pounds frequently; standing and/or walking for four hours and sitting for four hours in an eight-hour workday; is prohibited from lifting overhead or pushing/pulling with the upper extremities to operate hand controls; must avoid concentrated exposure to fumes and other respiratory irritants; needs the option to alternate sitting and standing every 30 minutes; and is limited to simple, routine work with a specific vocational preparation of one or two and minimal changes in the setting and routine that does not require significant decision making, contact with the public, or more than occasional contact with co-workers and supervisors; and allows for the use of a list as a memory aide. (Tr. 774–79.)

The ALJ found that Meier did not have past relevant work; however, the ALJ determined that based on Meier's age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that he could perform. (Tr. 779–80.)

As such, the ALJ found that Meier was not disabled from December 29, 2005, through the date of the decision, February 20, 2015. (Tr. 780.) The Appeals Council denied Meier's request for review (Tr. 762) and Meier subsequently filed a complaint challenging the decision in the United States District Court for the Eastern District of Wisconsin on February 14, 2019 (Tr. 727–28). The parties filed a stipulated motion for remand, and the case was remanded back to the Commissioner on January 15, 2020. (Tr. 752.)

On January 31, 2020, the Appeals Council vacated the Commissioner's previous decision and remanded the case to an ALJ. (Tr. 758.) In the Order, the Appeals Council stated that the original decision did not include an adequate evaluation of the opinion evidence, specifically the opinion of State agency medical consultant Dr. Roger Rattan (incorrectly named as Roger Raffin) regarding Meier's mental impairments. (Tr. 758–60.)

Meier's case was remanded to a different ALJ, who conducted a hearing on June 16, 2020. (Tr. 1899–1950.) Meier, now represented by counsel, testified, as did Thomas Heiman, a VE. (*Id.*) In a decision dated July 15, 2020, the ALJ found that Meier had the severe impairment of disorders of the neck prior to his date last insured, and after his date last insured, had the severe impairments of disorders of the neck and back, depression, and anxiety disorders. (Tr. 1855.) The ALJ found that Meier did not have an impairment or combination of impairments that met or medically equaled one of the Listings (Tr. 1858) and an RFC prior to his date last insured to perform light work with only frequent stooping (Tr. 1860). The ALJ found that after Meier's date last insured, he had the RFC to perform light work with the following limitations: no more than frequent stooping and avoid concentrated exposure to irritants such as fumes, odors, dust, and gases; limited to simple, routine, and repetitive tasks; no fast-paced work; only simple, work-related decision; occasional workplace

3

changes; no close proximity to others or in coordination with them; and only occasional contact with the public, co-workers, and supervisors. (Tr. 1863.)

The ALJ found that prior to his date last insured, Meier was capable of performing his past relevant work as a tattoo artist. (Tr. 1874.) The ALJ found that after Meier's date last insured, while Meier was unable to perform his past relevant work as a tattoo artist, considering his age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that he could perform. (Tr. 1875–76.) As such, the ALJ found that Meier was not disabled from December 29, 2005, through the date of the decision, July 20, 2020. (Tr. 1877.) Meier again appealed the denial to the Appeals Council and filed a complaint in federal court. (Tr. 1886.) The parties again stipulated to remand the case (*see* Docket # 21 in Case No. 20-CV-1463 (E.D. Wis.)), and the case was remanded on May 28, 2021 (Tr. 1886). In an order dated July 19, 2021, the Appeals Council remanded the case for the ALJ to properly address Meier's counsel's objection to the VE's testimony. (Tr. 1893–94.)

On remand, the same ALJ who held the second hearing held a third hearing on December 21, 2021. (Tr. 1821–47.) Meier, represented by counsel, testified, as did Susan Entenberg, a VE. (*Id.*) In a decision dated January 10, 2022, the ALJ found that prior to his date last insured, Meier had the severe impairment of disorders of the neck, status-post fusion and after his date last insured, Meier had the severe impairments of disorders of the neck and back, anxiety, and depression. (Tr. 1787.) The ALJ again found that Meier did not have an impairment or combination of impairments that met or medically equaled one of the Listings. (Tr. 1790.) Prior to his date last insured, the ALJ found that Meier had the RFC to perform light work but was limited to only frequent stooping and to avoid concentrated exposure to irritants such as fumes, odors, dust, and gases. (Tr. 1792.)

4

After his date last insured, the ALJ found that Meier had the RFC to perform light work, but limited to no more than frequent stooping and avoiding concentrated exposure to irritants, and further limited mentally as follows: limited to simple, routine, and repetitive tasks, with no fast-paced work; only simple, work-related decisions; only occasional workplace changes; limited to job settings with no close proximity to others or in coordination with them and only occasional contact with the public, co-workers, and supervisors. (Tr. 1795.) As before, the ALJ found that prior to his date last insured, Meier was capable of performing his past relevant work as a tattoo artist. (Tr. 1808.) The ALJ again found that after Meier's date last insured, while Meier was unable to perform his past relevant work as a tattoo artist, considering his age, education, work experience, and RFC, other jobs existed in significant numbers in the national economy that he could perform. (Tr. 1809–10.) As such, the ALJ found that Meier was not disabled from December 29, 2005, through the date of the decision, January 10, 2022. (Tr. 1811.) Meier now challenges this third decision in the instant case.

## DISCUSSION

### 1.    *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions

drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2. *Medical Evidence*

Meier challenges the weight given by the ALJ to the opinions of two consultative examiners who evaluated Meier's mental health impairments—Dr. Ciara Christensen and Dr. Roger Rattan. Thus, I will focus on and summarize Meier's mental health history during the relevant time period. In his application for disability benefits, Meier asserts that his ability to work was limited due to his anxiety and depression. (Tr. 217.) He alleges an onset date of December 29, 2005 (*id.*) which corresponds to the date of his motor vehicle accident (Tr. 50). While Meier told Dr. Christensen that he struggled with anxiety since he was "an early adult," he stated that his anxiety became more problematic as an adult. (Tr. 1232.) Meier, who suffered a subdural hematoma during the December 2005 accident (Tr. 268), stated that since the accident he experienced difficulties concentrating, difficulties with short-term memory, and increased anxiety. (Tr. 51.)

Prior to the accident, however, Meier stated that he was doing really well. (Tr. 50.) He had his own tattoo parlor and his work "got in magazines, trophies[;] I was doing excellent until then." (*Id.*) In other words, to the extent Meier suffered from anxiety prior to the accident, it was not affecting his ability to work.

Subsequent to the December 2005 motor vehicle accident, Meier did not begin treating with medical providers on a regular basis until 2009. Meier treated with internist Dr. Gojko Stula on a relatively frequent basis between April 2009 and February 2012. (*See, e.g.*, Tr. 313, 316, 319, 322, 326, 335, 338, 340, 350, 355, 371, 373, 378, 379, 385, 394, 412.) Throughout the course of the treating relationship, Dr. Stula consistently noted that Meier had depression and anxiety. Dr. Stula also noted that while Meier was attempting to do some work, he had to stop due to his back pain. (Tr. 316, 319, 322, 371, 373, 378.)

In May 2010, Meier was federally indicted for allegedly dealing in counterfeit money. (Tr. 2039–52.) Meier was sentenced to three years of probation. (Tr. 533.) In August 2011, Dr. Stula noted that Meier presented with "a high level of anxiety that requires alprazolam 2 mg 3 times a day, otherwise he is not very functional." (Tr. 316.) In February 2012, Dr. Stula noted that he had "a lengthy conversation" with Meier about "his past history of substance abuse, mental health problems." (Tr. 412.) Dr. Stula stated as follows:

> I received a letter from the US probation officers stating that [Meier] was positive for cocaine, methadone. His last urine was positive for heroin in September 2, 2009. Because of the complexity of his problem, addiction, mental health issues, I felt that I would like him to go to a more organized center. He will be seeing a psychiatrist and then referred to the pain management clinic. He understands my concern, so I told him that he is welcome to stay as my patient just for medical reasons but not for any kind of drug problem, pain, or for some mental health issue.

(*Id.*) On April 3, 2012, State Agency consultant Dr. Deborah Pape opined that Meier had the medically determinable impairments of anxiety and depression (Tr. 439, 441); however, she

7

concluded that Meier was no more than mildly limited in his activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace (Tr. 446). In support of this opinion, Dr. Pape found that Meier had not complained of serious mental problems or sought either outpatient or in-patient psychiatric care. (Tr. 448.) She noted that while his most longstanding diagnosis was for anxiety, his medication adequately controlled his symptoms. (*Id.*) Dr. Pape found that while Meier attributed memory and concentration issues to the hematoma from the 2005 motor vehicle accident, that there was no evidence in the medical records to document any significant neuropsychological affects from the accident. (*Id.*) Dr. Pape opined that any mental slowness or fog was likely caused by his medications. (*Id.*) Dr. Pape found that because Meier stated that he could pay attention for ½ hour at a time and follow spoken or written instructions, the evidence did not support more than a mild limitation in attention, concentration, memory, or comprehension. (*Id.*)

On January 23, 2013, Meier underwent a mental status examination with consultative examiner Dr. Mark Pushkash. (Tr. 532.) Dr. Pushkash noted that Meier was able to engage in basic activities of daily living in a self-initiated, self-directed, and autonomous fashion. (Tr. 533.) When asked about social interaction, Meier stated that: "I had a lot of acquaintances, but you find out who your friends are if something like this happens, only a few people stuck by me, sometimes I go over to their house, sometimes I might take a short walk, that's about it." (*Id.*) Dr. Pushkash noted that Meier "gets along reasonably well with others and is not prone to argumentativeness, impulsiveness, or aggression." (*Id.*) However, he was "much more withdrawn than he used to be." (*Id.*)

On mental status examination, Dr. Pushkash did not observe any word finding difficulties or obvious impairment in long-term or short-term memory. (Tr. 534.) His affect

was constricted and his mood was somewhat sad. (*Id.*) He did not, however, describe persistent sadness, but believed he had anxiety for most of his life. (*Id.*) Meier periodically had panic attacks involving increased heart rate, difficulty breathing, and avoidant behavior. (*Id.*) Dr. Pushkash opined that Meier was capable of comprehending, recalling, and following-through on instruction; his ability to concentrate and persist on tasks was mildly to moderately compromised from anxiety; but he was able to appropriately relate to supervisors and co-workers. (Tr. 535.) Dr. Pushkash noted that Meier found it difficult to cope with day-to-day stress because of his chronic pain. (*Id.*)

On March 5, 2013, State Agency consultant Dr. Roger Rattan evaluated Meier. (Tr. 98–99.) Dr. Rattan opined that Meier had mild limitations in activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence, or pace. (Tr. 99.) As to sustained concentration and persistence, Dr. Rattan opined that Meier was moderately limited in the following areas: the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; the ability to work in coordination with or in proximity to others without being distracted by them; and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. In so finding, Dr. Rattan explained that Meier should have no problems carrying out either simple or detailed instructions; however, his persistence and pace may be affected. (Tr. 103.) Dr. Rattan also found that Meier should have no problems concentrating well enough to complete tasks if he was in a job setting where he was not distracted by having to work in close proximity to others or in coordination with them. (*Id.*)

9

As to social interaction, Dr. Rattan found Meier moderately limited in his ability to interact appropriately with the general public and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 104.) Dr. Rattan explained that because Meier reported increased anxiety around a lot of people, he would do best in a job situation that does not involve frequent public contact or constant, ongoing contact with co-workers and supervisors. (*Id.*) Finally, as to adaptation, Dr. Rattan found Meier moderately limited in his ability to respond appropriately to changes in the work setting. (*Id.*) He explained that due to Meier's anxiety, he may do best in a job that does not require changing tasks from day to day, but rather has a fairly regular set of duties and expectations. (*Id.*)

From February 2013 through July 2021, Meier treated with several providers, including a new internist, Dr. Gilberto Marquez, Jr., pain management physician, Dr. Jennifer Klopfstein, and nurse practitioners, Terry Zacharias and Nate Sullivan. Dr. Marquez managed Meier's mental health medications during this time period.

In 2013, Meier treated with Dr. Marquez approximately five times and with NP Zacharias and Dr. Klopfstein approximately once each between February and August of that year. During these visits, none of the providers noted any mental health issues upon physical examination of Meier. (Tr. 551, 555, 557, 559, 561, 617, 627.) In fact, Dr. Marquez noted Meier reported no anxiety symptoms at three of the five appointments. (Tr. 557, 559, 561.) Both Dr. Klopfstein and NP Zacharias noted, however, that Meier could only work very limited hours as a tattoo artist due to his physical pain. (Tr. 617, 627.)

In 2014, Meier treated with NP Zacharias approximately three times. In May, NP Zacharias noted that Meier was taking a three-week trip to Georgia and was driving thirteen

hours. (Tr. 594.) Meier's mood and affect were normal upon physical examination. (Tr. 595.) In July and September, NP Zacharias noted Meier's mood and affect were again normal. (Tr. 586, 591.)

In 2015, Meier treated several times with NP Zacharias. In February, Meier stated that he was leaving for a twelve-hour drive to Arkansas. (Tr. 1243.) He reported that he was having problems with his memory, which was why he forgot to get a lumbar x-ray. (*Id.*) While Meier reported being nervous/anxious, NP Zacharias noted Meier's mood and affect were normal upon physical examination. (Tr. 1244.) Again in April, Meier reported to NP Zacharias difficulties with short-term memory, stating he had these issues since the motor vehicle accident, and reported nervousness/anxiousness. (Tr. 1255–56.) His mood and affect upon physical examination, however, were normal. (Tr. 1256.) In June, Dr. Klopfstein observed Meier's affect as blunt or flat upon examination. (Tr. 1268.) And in August, NP Zacharias noted that Meier was requesting a letter stating that he was disabled to support his disability application, and NP Zacharias stated that he would send Meier for a functional capacity evaluation. (Tr. 1281.) While Meier reported anxiety, NP Zacharias' physical examination showed a normal mood and affect. (Tr. 1282.)

Meier treated with NP Zacharias in 2016. In March, Meier reported to NP Zacharias that he was "still trying to get disability." (Tr. 1315.) While Meier reported nervousness and anxiety, his mood and affect were normal upon physical examination. (Tr. 1316.) In July, Meier told NP Zacharias that his disability was denied and that he had retained a lawyer (Tr. 1340), but again his affect was normal (Tr. 1342). In October, Meier told NP Zacharias that a friend passed away unexpectedly, so he drove from the Dells for the appointment and had to drive back to the Dells afterwards. (Tr. 1354.) Meier's affect was normal. (Tr. 1356.)

In 2017, he treated with Dr. Klopfstein in May, who noted that his "medications are working well most of the time." (Tr. 1378.) Upon review of systems, Meier did not note anxiety or depression. (Tr. 1379.)

In 2018, Meier treated with NP Zacharias, Dr. Marquez, and Dr. Klopfstein. In June, Meier reported to NP Zacharias that he was going camping in an RV that weekend (Tr. 1462) and while he reported anxiousness, his affect was normal on physical examination (Tr. 1463). In October and November, Dr. Marquez noted that Meier's anxiety was "stable" and he should continue with his medication. (Tr. 1067, 1073.) Meier did not endorse any anxiety or depression symptoms during his November appointment with Dr. Klopfstein. (Tr. 1117.) He stated that his medications allowed him to do his activities of daily living. (Tr. 1120.)

In 2019, Meier treated with Dr. Marquez, Dr. Klopfstein, and NP Sullivan. In January, Dr. Klopfstein again noted that Meier was able to do his activities of daily living, including exercising almost daily, with his medications. (Tr. 1136.) He did not endorse anxiety or depression. (Tr. 1134.) In February, Dr. Marquez noted that Meier's anxiety was "stable" and that he should continue with the same medications. (Tr. 1087–88.) In March, however, Meier stated to Dr. Marquez that a family member was hospitalized, so his anxiety increased. (Tr. 1095.) Meier stated that prior to this incident, however, he had been doing well. (*Id.*) Dr. Marquez described Meier's anxiety as "situational" and planned to "monitor for now" and continue with his same medication. (Tr. 1096.)

In April, Meier did not report anxiety or depression to Dr. Klopfstein. (Tr. 1151.) In August, NP Sullivan noted that Meier was "occasionally" still working as a tattoo artist; however, his working tolerance was about one hour due to pain. (Tr. 1189.) His mood and affect were normal upon physical examination. (Tr. 1190.) In September, Dr. Marquez noted

12

that Meier's anxiety was "stable" and that he experienced panic attacks "on occasion," but was "for the most part doing well." (Tr. 1691.) Dr. Marquez did not change his anxiety medication. (Tr. 1693.) On October 11, 2019, NP Sullivan again noted that Meier was no longer working regularly as a tattoo artist because he could not physically perform the work due to his back pain. (Tr. 1588.)

Approximately two weeks later, on October 28, 2019, Meier underwent a consultative examination with Dr. Ciara Christensen. (Tr. 1228.) Dr. Christensen noted that Meier alleged complications due to memory loss, anxiety, and depression. (*Id.*) Dr. Christensen stated that this meeting was the first clinical interaction between Meier and herself. (*Id.*) Dr. Christensen observed that Meier made consistent eye contact throughout the evaluation, that his motor activity was hyperactive and he needed to reposition himself due to physical discomfort, his mood was depressed with anxious undertones, his affect was congruent with his mood, his speech was at times pressured, his thought processes were intact, he became tangential but was receptive to redirection, and his thought content did not evidence concerns for paranoia or hallucinations. (*Id.*)

Dr. Christensen concluded that at this point in time, Meier was a poor candidate for any type of competitive employment. (Tr. 1238.) She opined that his behavior and cognitive changes had worsened as a result of the 2005 motor vehicle accident and that it was likely that these would interfere with interpersonal, social, and occupational areas of functioning. (*Id.*) Dr. Christensen opined that Meier would have difficulty understanding basic instructions, tolerating interactions between supervisors and co-workers, and that his ability to cope with routine stress and adapt to changes would be impaired. (*Id.*)

Meier again treated with Dr. Klopfstein in December 2019, in which he did not report any psychiatric issues. (Tr. 1615.)

In 2020, Meier treated with Dr. Marquez, Dr. Klopfstein, and NP Sullivan. In February, Dr. Marquez noted that Meier's anxiety was "slightly worse" due to two recent deaths in the family; however, Meier felt that he was "dealing with it well with good family support." (Tr. 1740.) Thus, Dr. Marquez noted that while Meier's anxiety was "increased due to personal issues," because Meier "feels it is getting better," he should continue with his current medication. (Tr. 1742.) Later that month, Meier did not report any mental health issues to Dr. Klopfstein. (Tr. 1639.) In August, however, Meier reported to Dr. Klopfstein that he was "very anxious about being out of his home." (Tr. 2224.) Dr. Klopfstein noted that Meier's pain medications allowed him to perform his activities of daily living, including walking most days of the week. (Tr. 2227.) She expressed concern, however, regarding his use of opiates with his "large dose" of alprazolam for anxiety. (*Id.*) Dr. Klopfstein allowed Meier to choose which medication to decrease, and he chose to decrease his morphine. (*Id.*)

In September, NP Sullivan noted that Meier's pain was worse since the reduction in his pain medication the previous month. (Tr. 2215.) Meier stated that he had a few weeks of nausea, vomiting, and sweating, and that his anxiety was worse during that time as well. (*Id.*) In November, Meier informed Dr. Klopfstein that he was having a lot more problems with anxiety and depression and that his primary care physician referred him to psychiatry. (Tr. 2199.) He had gotten a new puppy which had helped decrease his depression, but not his anxiety levels. (*Id.*)

In 2021, Meier treated with Dr. Klopfstein in January and March. (Tr. 2164, 2184.) At these appointments, Meier did not report symptoms of depression or anxiety. (*Id.*) Also in

March, Meier went to urgent care complaining of swelling in the right hand and redness on the bilateral upper cheeks lasting approximately one week. (Tr. 2252.) At this appointment, Meier denied any recent symptoms of anxiety and depression. (*Id.*) The provider concluded that Meier had contact dermatitis from the gloves he wears while tattooing. (Tr. 2254.) Upon physical examination, the provider observed the swelling of his hands stopped at the wrist consistent with a glove line. (Tr. 2253.) In May, Meier reported "increased stress" to Dr. Klopfstein from having to put his dog up for adoption but did not report depression or anxiety. (Tr. 2146–47.) In July, Meier again reported "some increased stress" to Dr. Klopfstein due to the recent death of his uncle but did not report depression or anxiety. (Tr. 2130–31.) At the administrative hearing in December 2021, when the ALJ asked Meier about the March urgent care visit in response to Meier's testimony that he had not done any tattooing since the June 16, 2020 hearing, Meier testified that he did not "remember any of that." (Tr. 1831–32.)

### 3.   *Application to This Case*

In the ALJ's most recent decision, he accords little weight to Dr. Christensen's opinion and some weight to Dr. Rattan's opinion. (Tr. 1804, 1807.) Meier challenges the ALJ's determinations as to both of these opinions. I will address each in turn.

#### 3.1   Weight Given to Dr. Christensen's Opinion

As stated above, this is Meier's third trip to federal court on disability applications filed over a decade ago stemming from a motor vehicle accident that occurred going on two decades ago. Both times prior to this one, Meier and the Commissioner stipulated to remand his case to the Administration for further action. In this round of review, Meier only challenges the weight given to the opinions of Drs. Christensen and Rattan.

15

While Meier challenges every aspect of the ALJ's evaluation of Dr. Christensen's opinion, his rejection of her opined limitations is well-supported by the record. Again, the ALJ gave little weight to Dr. Christensen's opinion. (Tr. 1807.) While Dr. Christensen's evaluation and opinion is summarized above in the context of the entirety of Meier's mental health treatment history, the crux of the opinion is that Meier is a poor candidate for any type of work and that his behavioral and cognitive changes worsened since the accident and would interfere with his ability to understand basic instructions, tolerate interactions with supervisors and co-workers, cope with routine stress, and adapt to changes. (Tr. 1238.)

In evaluating this opinion, the ALJ found that Dr. Christensen's assessment was inconsistent with her objective examination findings, including Meier's ability to tolerate the evaluation, answer, follow through on examination tasks, respond to redirection, maintain consistent eye contact, and display social brightening as the evaluation progressed. (Tr. 1807.) The ALJ further found that Dr. Christensen was relying on Meier's subjective reports of his daily activities and functioning, which were inconsistent with his reports to other providers that he could perform his daily activities and work as a tattoo artist. (*Id.*) The ALJ also found that Dr. Christensen offered "imprecise" statements, stating that Meier's abilities were "impaired" but failing to describe the degree of impairment. (*Id.*) Finally, the ALJ found that Dr. Christensen's opinion was inconsistent with that of Dr. Mark Pushkash, who completed a consultative mental status examination of Meier on January 23, 2013, and opined Meier had no more than moderate limitations. (*Id.*) The ALJ stated that there was no evidence to support a decline in Meier's cognitive functioning since Dr. Pushkash's examination. (*Id.*)

Meier argues that "multiple problems" with the ALJ's assessment exist (Pl.'s Br. at 8–18); however, when Dr. Christensen's evaluation and opinion is reviewed in the chronological

context of the entirety of Meier's mental health treatment history, the unsupportability of her opinion becomes abundantly clear. First, Meier faults the ALJ for citing to the "general citations" in the administrative record (i.e., 19F, 26F, etc.) without specifying the exact pages. (*Id.* at 9.) Meier argues that these records consist of 682 pages and the ALJ should not expect "this Court to scour the record to glean support for his finding." (*Id.*) This is not a situation, however, where the ALJ failed to cite to the record, and the record is not so cumbersome that the lack of citation to precise record pages hindered judicial review.

Meier next faults the ALJ for finding that his reports of daily activities and functioning given to Dr. Christensen were inconsistent with his reports to other providers regarding his daily activities and his work as a tattoo artist (*id.* at 9–12) and argues the ALJ cherry-picked Dr. Christensen's objective examination of him and the record as a whole (*id.* at 12–15). Finally, Meier argues the ALJ "played doctor" by finding that his condition did not deteriorate between Dr. Pushkash's and Dr. Christensen's evaluations. (*Id.* at 15–16.)

None of these arguments have merit. There are over sixteen years between the 2005 motor vehicle accident and the ALJ's most recent 2022 opinion. Meier argues that he has suffered from anxiety for most of his life; however, the 2005 accident exacerbated it, and also caused depression and memory issues. Building on Meier's subjective complaints and the statements of Meier's mother, Dr. Christensen opined that the 2005 motor vehicle accident altered Meier's independence to complete his activity of daily living. (Tr. 1237.) Dr. Christensen found that Meier had low stress tolerance, increased distractibility, and difficulty following multi-step instructions. (*Id.*) She generally opined that Meier would be unable to work because not only could he not follow multi-step instructions, but he could also not follow

17

basic instructions, could not tolerate interactions with co-workers and supervisors, and could not cope with routine stress or adapt to changes. (Tr. 1238.)

Meier argues that as an expert, Dr. Christensen is in the best position to analyze her own mental status examination of Meier, including his subjective complaints, and determine the nature and extent of Meier's mental impairments. (Pl.'s Br. at 11.) While that is certainly true, "an ALJ is not required to credit the agency's examining physician in the face of a contrary opinion from a later reviewer or other compelling evidence." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). And the record evidence contradicting Dr. Christensen's findings is indeed compelling.

To begin, Meier never sought treatment from a mental health professional, even when the internists he was treating with suggested that he do so. In fact, Meier did not seek regular treatment for either his physical or mental impairments until years after the accident. In March 2009, Dr. Stula noted that Meier had a history of anxiety and depression and that he was taking 2 mg of alprazolam twice a day. (Tr. 396.) Meier continued on this dose of medication for years. (Tr. 340, 350, 355, 371, 373, 378, 379, 385, 394.) Then, on August 30, 2011, Dr. Stula noted that Meier "presented himself with a high level of anxiety that requires alprazolam 2 mg 3 times a day, otherwise his is not very functional." (Tr. 316.) After Meier's medication dosage was increased in mid-2011, it stayed the same for the rest of the relevant time period. (*See* Tr. 2091, reported taking 2 mg of alprazolam for anxiety on November 12, 2021.)

While Dr. Christensen opined that Meier was unable to independently complete his activities of daily living after the accident, the record supports Dr. Stula's opposite opinion that while on 2 mg of alprazolam three times a day, Meier was "functional." (Tr. 316.) In

fact, by the time Meier was treating with internist Dr. Marquez in 2013, he consistently presented with a normal mood and affect upon physical examination, and Dr. Marquez noted on multiple occasions that Meier was experiencing no symptoms of anxiety. Even when Meier's anxiety was exacerbated in 2019 and 2020 due to various life circumstances, Dr. Marquez described the anxiety as "situational" and declined to adjust his medication. Depression is rarely mentioned in the treatment notes after Meier's treatment with Dr. Marquez begins, and I find only two instances of reported memory difficulties, both to NP Zacharias in 2015.

Dr. Christensen further opined that Meier would have difficulty following instructions, concentrating, and interacting with others. And while Meier faults the ALJ for relying on his ability to tattoo in discounting Dr. Christensen's opinion, this conclusion is completely appropriate as the evidence indeed undermines Meier's statements of disabling mental health symptoms. Again, Meier does not challenge the ALJ's assessment of his physical impairments. And the record is clear that while Meier was no longer capable of performing his past work as a tattoo artist on a consistent basis after the 2005 motor vehicle accident, this was because of his back impairments, *not* his alleged mental health impairments. (Tr. 275, 316, 319, 322, 373, 378, 538, 617, 627, 1189, 1217, 1588, 2254.) Meier reported that he was "no longer working regularly as a tattoo artist. [His] bending and working tolerance is not long enough for him to be doing any tattoo work. He finds he has to frequently change positions and try to stretch." (Tr. 1588.) Given there is no indication in the record that Meier's anxiety or depression prevents him from performing his tattoo work, the fact that he continues to perform some work as a tattoo artist, even on an inconsistent basis, indeed contradicts Dr. Christensen's assessment that Meier has a short attention span; struggles to complete tasks

independently; and is unable to properly interact socially—all skills one would presumably exercise as a tattoo artist.

Meier further faults the ALJ for allegedly cherry-picking both Dr. Christensen's opinion and the record as a whole. But both the objective medical evidence as described above, and Meier's reported activities of daily living to other providers, indeed contradicts Dr. Christensen's opinions. As one particularly notable example, Dr. Christensen states that because of Meier's reported memory impairments, his driving ability may be negatively impacted and the extent of his driving ability may require further assessment. (Tr. 1236.) But this statement comes immediately after she notes that Meier himself reports that he can drive to and from locations without difficulty. (Tr. 1236.) Furthermore, the record evidence available to Dr. Christensen at the time shows Meier completed a thirteen-hour drive to Georgia in 2014, a twelve-hour drive to Arkansas in 2015, and a drive back and forth from the Wisconsin Dells on the same day in 2016 due to the unexpected death of a friend. This evidence undercuts multiple of Dr. Christensen's conclusions, such as his alleged difficulties with concentration and distractibility (as long drives take sustained concentration) and his difficulties with adaptability and social interactions (travel back-and-forth from the Milwaukee area to the Wisconsin Dells on the same day to attend both a medical appointment and to deal with a friend's unexpected death). The record evidence also contradicts Dr. Christensen's opinion that Meier cannot cope with routine stress. Again, even when Meier experienced cases of non-routine stress, such as deaths in his family, Dr. Marquez did not feel the need to alter Meier's anxiety treatment in any way.

Finally, Meier argues that the ALJ impermissibly "played doctor" when he found that Dr. Christensen's opined limitations were inconsistent with Dr. Pushkash's, when "there is

no evidence to support a decline in cognitive functioning" between Dr. Pushkash's 2013 evaluation and Dr. Christensen's 2019 evaluation. (Tr. 1807.) But this is not the ALJ "playing doctor"; rather, this is a rational and well-founded observation based on the record as a whole. It is entirely unclear how Dr. Christensen could opine the limitations that she did had she taken careful review of the record. In fact, in the months directly preceding her evaluation, Dr. Marquez reported that Meier's anxiety was "stable" (Tr. 1087, 1691) and Meier himself indicated that he was generally doing well (Tr. 1095, 1691). Again, when viewing Dr. Christensen's evaluation and conclusions regarding Meier's limitations against the record as a whole, it is clear that the ALJ did not err in assigning little weight to this opinion. Remand is not warranted on this ground.

### 3.2    Weight Given to Dr. Rattan's Opinion

Meier argues that the ALJ gave significant weight to the opinion of State Agency consultant Dr. Rattan but failed to adequately address those findings in the RFC. (Pl.'s Br. at 18–25.) As an initial matter, it seems Meier is confused about which opinion of Dr. Rattan the ALJ gave significant weight to, and which evaluation he now challenges. The ALJ gave significant weight to Dr. Rattan's opinion regarding Meier's mental health assessment for the period *prior* to his date last insured. (Tr. 1789 and Pl.'s Br. at 18, citing R. 1789.) Meier then states the ALJ failed to encapsulate the opinion into the RFC found at page 1795 of the transcript, which addresses the RFC for the period *after* his date last insured. (Tr. 1795 and Pl.'s Br. at 18, citing Tr. 1795.)

As to the period *after* his date last insured, the ALJ accorded "some weight" to Dr. Rattan's opinion. (Tr. 1804.) The ALJ found that Dr. Rattan's assessment was generally consistent with the record evidence, confirming that Meier was able to work in a setting with

21

occasional contact with the public, co-workers, and supervisors and to concentrate so long as he does not work in close proximity to others or in coordination with them. (*Id.*) The ALJ further found that "Dr. Rattan's conclusion that the claimant could perform simple instructions is in keeping with the absence of cognitive deficits during the claimant's 2013 consultative examination with no intervening decline and the claimant's ability to continue to work as a tattoo artist in a limited capacity, drive and tend to his daily activities." (*Id.*) The ALJ also found that Meier's "ability to perform simple tasks and make simple decisions in a job setting with occasional change is supported by his treatment largely provided by his primary care provider, his normal mood and affect and cooperative behavior on examination, and the stable nature of the claimant's anxiety as well as his ability to tend to daily tasks." (*Id.*)

Where the ALJ diverges from Dr. Rattan's assessment is in addressing Dr. Rattan's findings of moderate limitations in Section I of the MRFCA form. Specifically, the moderate limitations in: his ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and complete a normal workday/workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 1804.) The ALJ takes care to explain that in the Section III narrative, Dr. Rattan specifically clarified his findings, explaining that Meier "would have no problems concentrating well enough to complete tasks," as long as he was in a job setting where he was not distracted by having to work in close proximity to others or in coordination with them and where he had only occasional interaction with others. (*Id.*) The ALJ explained that he incorporated these limitations into the RFC. (*Id.*) The ALJ further explained that he was rejecting Dr. Rattan's opinion that

22

Meier required an unreasonable number and length of rest periods, pointing to his conservative mental health treatment, stable anxiety, normal mental status examinations, and the ability to complete daily tasks as support. (Tr. 1805.)

Meier's argument regarding how the ALJ erred is difficult to follow. It appears in his reply brief, Meier focuses on Dr. Rattan's limitation that Meier "is able to complete tasks more on his own." (Pl.'s Reply Br. at 8–11.) Meier somehow extrapolates that what Dr. Rattan must have meant by this limitation is that the "requirement to complete tasks independently requires that no one is waiting on Meier to complete his work or that interaction is not necessary to complete the tasks Meier is set." (*Id.* at 9.) But that is not what Dr. Rattan said. Rather, Dr. Rattan explained that if Meier was placed in a job setting where he does not need to work in close proximity or in coordination with others and can complete "tasks more on his own with only occasional contact with co-workers and supervisors," this would allow him to perform the job. (Tr. 103.) The plain language of this explanation is that Meier needs a job with only occasional contact with co-workers and supervisors, not in close proximity, and not working in coordination with them. That is precisely what the ALJ limited Meier to in the RFC. (Tr. 1795.) *Pavlicek v. Saul*, 994 F.3d 777 (7th Cir. 2021) teaches that if Section III of the MFRCA form encapsulates all of the Section I limitations, then the ALJ can rely on it. *Hoeppner v. Kijakazi*, No. 20-CV-582, 2021 WL 4199336, at *8 (E.D. Wis. Sept. 15, 2021)*. The ALJ explains in great detail how Dr. Rattan translated those limitations found in Section I into the narrative in Section III, and which Section I limitations he was rejecting and which he was crediting and why. There is no error in the ALJ's assessment of Dr. Rattan's opinion. Thus, remand is not required in this regard.

**CONCLUSION**

On Meier's third trip to federal court, he argues that the ALJ erred in his evaluation of the opinions of two consultative examiners regarding his mental impairments. The ALJ's decision in this case is well supported by the substantial evidence in the record. The Commissioner's decision is affirmed. The case is dismissed.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 25th day of September, 2023.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge

24